I'm Ronald Horisco. I'm the attorney for the appellant's defendants, Global Inc. Capital Markets, and William Horisco, Thomas Emerton, and Kenneth Harrison is also one of the Global Inc. I think part of the clarification, first of all, I'm not a defendant in this case. The other, Horisco, is my brother. But I think it If I can categorize these parties, there's many parties named as the defendants in this case, and it really breaks down to three groups. There is the Higher Investment Technologies, Inc., and John Adams, who was the principal in that particular entity, has nothing to do with the USRBT facts. It was not associated with the USRBT. The only connection is that Mr. Adams wasn't one time an employee of the USRBT bank for several years and was instrumental in operating that bank. But the High Investment Technologies that Mr. Adams has named in this particular case, well, the Higher Investment Technologies, has nothing to do with the USRBT case. The next group is the, and all of the rest of the defendants, including the relief defendants, are all related in one way or another, both literally or figuratively, with USRBT. The Driving Hawks was the Indian family that opened and started the bank, and everything else, all the relief defendants were entities totally controlled by them. Smedley, and again Adams, was at one time an employee of the USRBT. So that's the second group, and that's the main group that this case is about. Global Link Group, which is Global Link Capital Markets, William Marisco, Harrison, and Emerton, were not associated with the bank in any respect. They were at arm's length transactions with the bank, referring, and that's their sole thing that they did, was they referred large depositors to USRBT's CD, Certificate of Deposit, program. But they were not in no way related, they had nothing to do with the operation of the bank, they knew nothing about what the USRBT was doing, but they did refer clients to them, and then of course that there were documents and representations and so on that they made. When the SEC filed their complaint, they lumped all these people together. Higher investment technologies probably shouldn't even been part of this case at all, it should have been filed as a separate action perhaps. But in any event, what occurred here is that there are three main issues. And the first issue is, is USRBT a bank? The second issue is, are the securities or the insurance they were offering, the CD and the enhancement contract, are they securities under the Securities Act? Well, the SEC and the customs who did the seizure, before they answered the first question, they jumped hastily into the fact that these were securities and there were violations of the Securities Act going on and all kinds of fraud. And they released their news release that was on the internet, picked up by the news people, that touted this whole thing as an 88 million dollar prime bank note scheme. And I'll get into that information. They seized the assets of the USRBT. They essentially put this bank out of business before they really knew what they were doing, before they really had the facts, before they had really investigated. The information they relied upon was hearsay from people such as a bank clerk at Bank of America who said these investments, there were transactions coming in, wire transfers into their bank account of USRBT, and there were checks being written out of USRBT's checking account. And they actually dubbed that as money laundering. And we're talking about substantial amounts of money, 10, 20 million dollars. However, the money that was coming in under the program were depositors' monies being deposited in the USRBT bank. And there were interest payments to the CD holders from the previous CD issues. And, of course, that's, on that information, they acquired the securities. But isn't the problem that there were also promised a share of profits and that there was going to be substantial and so on? A profit-sharing agreement. Yes. That's the problem, right? It's that it wasn't simply a share of profits That's right. There was an agreement with it. It was an offer. They said you would get, there was no promise. This was like giving someone a toaster. I had an expert who's a witness in the exhibits of the excerpts of the record, Mr. Easton, who explained that this is normal banking practice. What really was there? But that's really the second issue. The first issue is, is USRBT a bank and should they have approached this bank in that fashion, recognizing the sovereignty of this Indian bank? Their own records indicate that they were apparently unaware of the status of the USRBT bank. They knew that the bank had a license. What is the relevance of whether there were a bank? I'm sorry, Your Honor? What is the relevance of whether it was a bank? Well, because if it were a bank, then these, the CD and the enhancement contract would be exempt in securities law. Why? Because under 77A2 indicates that all, they list every possible financial thing as a security, and it said except if it's a bank, they're exempt. Any old bank? Any old bank? Well, any bank that can be recognized as a bank, and that's the problem. They didn't recognize that the Indians had the sovereignty right to license a bank and they could operate without a charter from the federal or state government, and the fact that they didn't know that in their own documents, Gortimer's RBT complaint, they say the USRBT was not licensed by either a federal or state charter. Well, so what? They were licensed by the Indians. I don't understand how, what difference does it really make if, in fact, this is a security, and therefore under the aegis of the Securities and Exchange Commission, what you call the entity that's dispersing it? What, it doesn't make any difference. If this is a security, and the SEC is charged, especially in the anti-fraud provisions, with making sure that doesn't go on here in the United States, it doesn't matter whether it's a Navajo or a Choctaw, they really can't go ahead without being supervised by the SEC. Once there's a complaint, whatever it is, it starts the ball rolling. Well, Your Honor, I'm glad you bring it up, because frankly, the SEC has filed an additional case from the Fifth Circuit that said that, well, the securities exemptions don't apply to fraud statutes, the fraudulent aspect of the securities. So, that's right, you can jump right into where's the fraud, and analyze it as a security, and determine whether or not it is a security, and there's a myriad of cases about agreements, and CEDs, and whether these things are part of the investment contracts. I guess you have a point on that issue. But here, there was attachments to this CED, which sort of took it out of that. Well, that doesn't automatically make it a security, because there are cases like the Weaver versus the... It's true, it does it automatically. But in this instance, it seems logical that that's what this would be called. I mean, it had attached to it, as I gather, a profit-sharing agreement, and some other agreement that Judge Verzon alluded to. Well, all right, let me just maybe clarify as much as I can with respect to this agreement. There was the CED that offered a little above market rates of interest, and there was the agreement, and whether it was, you know, maybe a lot of mistakes were made with respect to language, and even the execution and implementation by the bank not being, you know, fully, maybe fully knowledgeable of the banking industry. But the instrument that they did have said that they would only receive the 20 percent of share of the profits if they had a profit. There was no promise. The investors didn't come in here... There's never a promise with our security. It's always contingent. If we have money, we'll pay you. That's why it's an investment and not a debt. Well, all right, and okay, let's move to the third point. Here's the point, Your Honor, and this is why I say it was premature for these people to put this bank out of business without knowing what they were doing. They alleged $88 million fraud. They alleged laundering of money. They alleged a Ponti scheme. They alleged a prime bank note scheme, and not a single one of them could they prove or was it true. And how do I know that? There was $78 million, $10 million was the high investment technology that had nothing to do with this case. $78 million was passed through the USRBT bank through the CD program. The receiver in this case... Could you tell me what this has to do with your brief, the argument you're making now? I covered that in my reply brief extensively. First of all, you can't cover things, you can't come up here and discuss things that you only covered in your reply brief. Well, I understand you, but these are the points that I want to make with the Court. There was no prime bank note scheme and there's no evidence to prove it because the money all went back to the depositors. The money when they seized the bank was what was left. Yes, driving hawks took money, about $4.5 or $8 million from the money totally, but the SEC kept alleging throughout this whole case that the bank never invested the money and never made any money. They made, in a matter of five months, with a trading program of $5 million in currency trade, they made close to $700,000. And I covered that, and then it annualizes out to 50% return on your money in a year. I thought you had consented to permanent injunctions except for preserving the right to appeal the question of whether this is a security and that the merits of this case are not before us. Am I wrong? No, the two issues were whether it was a bank that was presented to the Court alone, which we're appealing. And whether or not it was a security. Whether or not it was a bank and whether or not it was a security. Okay, so what you're now arguing is nothing, is by the boards. It's been, you've stipulated to an agreement. Well, no, my issue is, yes, if this is a bank, then there is no security. I understand that, but you just stood up here and started arguing the merits of the case, and I said it's not in your brief, and you said it's in your reply brief. But not only is it not in your brief, it's also something you've already stipulated to. We never stipulated that there was fraud. But you stipulated to an injunction that it was premised on there being fraud, and so what's the relevance of whether there was fraud? Well, what's relevant is that what I'm trying to point out is that before the SEC knew what they were doing, they seized this bank and put it out of business. This was a sovereign Indian bank. They had the right, the respect and the recognition of a bank. Okay. And consequently, the underlying reason for putting them out of business never came to fruition. You know, it's the same thing as, you know, the unlawful search and seizure and the, you know, the poison fruits of the other. Would you like to save some time for rebuttal? Yes, Your Honor. Thank you. Thank you. Thank you. Your Honor, it's William Shirey for the Securities and Exchange Commission. The instruments here were securities, as we demonstrated in our brief. They were investment contracts because of the LPSA component. I think we demonstrated that fairly clearly in our brief. They meet the definition set forward in Howey. Furthermore, one of you pondered the question of whether or not because they were labeled CDs. Was that component of it somehow maybe outside of the securities? Marine Bank, decided by the Supreme Court in 82, makes clear. Weaver? Marine Bank versus Weaver, yes. It's not the fact that you label something a CD, or even the fact that it's issued by an entity holding itself out to be a bank that takes you securities laws, no. What it is, is that there is an alternative, adequate, federal, regulatory regime that protects U.S. investors. That's what was at issue in Marine Bank versus Weaver. You take a different case, the Second Circuit's decision, cited by the District Court below, Gary Plastic Packaging versus Merrill Lynch, 756 Federal 2nd 230, Second Circuit decision. There, the Second Circuit was dealing with a certificate of deposit issued by Merrill Lynch, not a national bank, a federally regulated bank, but an investment bank, Merrill Lynch's. The Second Circuit said, this CD is a security. Actually, if you'll allow me, I'll quickly quote from them. They said, the crux of the Marine Bank decision regarding CDs is that the federal banking regulation and the federal deposit insurance eliminate the protection of the investor, thereby obviating the need for the protection of the federal securities laws. That wasn't the case here. The defendants have come forward with nothing. There's no evidence that there was some kind of insurance on these, on this Indian general licensed bank, nor was there any kind of comparable oversight that would be comparable to what the FDIC and the federal banking authorities provide. As evidence of that is the fact that the $50 million that was paid back to investors, that $50 million was Ponzi payments. It was the money that was taken in from the first investors and paid out to the latter investor. Switch that. I'm sorry. Apologies. Taken it from the latter investors and paid back to the FDIC. But that's more relevant when you raise it than when he raises it. We have an injunction. The merits of the case are not before us. Exactly. So in any event, I'll be very quick here. The CDs were securities. The investment contract, the LPSA was an investment contract. The transaction gets analyzed as one scheme under this Court's decisions in Hocking and Rubera. I think that's fairly clear. I think we've demonstrated that in our brief. Furthermore, I'd like to close with one additional thing. As we demonstrated in our brief, Section 382 of the 33 Act does not apply here. We probably were a little less clear than we should have been in the court below because we actually litigated on the question of whether or not this was a bank. It wasn't a bank. The defendants came forward with none of the evidence to show that it was actually supervised that way. So either way you cut it, 382 doesn't apply. There's actually a definition of bank, and this doesn't come in. I'm sorry, Your Honor. Definition of bank, and this just doesn't come in. It just doesn't come in. And there's actually a third reason it doesn't. I'm going to just offer it to Your Honors. If you actually look under Section 2A.6 of the 33 Act, there's actually a definition of territory. And because here they actually under 382, the exemption at issue, it actually says it has to be a state or the District of Columbia or a territory. Territory is actually defined. We don't really need to go there, though, do we? Oh, okay. Your Honor. We don't need to resolve this case. There are many ways. I think we win here. If there are no further questions, the commission rests. Thank you. I just want to make a couple of points. He mentioned a point that there was a Ponzi and the $50 million to pay to other people. That's not true. That doesn't matter. It doesn't matter when he says it or it doesn't matter when you say it. It just isn't relevant. Well, what's relevant is whether this is a bank or not, because that cuts everything off. And that's the issue really here. Is this the Indians, are they entitled to the respect of the sovereignty to issue their own bank licenses? And should the government agencies respect that sovereignty? Okay. You already made that point. Very well. Thank you, Your Honor. All right. Thank you. We appreciate your arguments. The matter will be submitted, and that ends our session for the day.
judges: Paez, Berzon, Baer